IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JAMES B. WISE,
      Plaintiff,

vs.                               Case No. 3:08cv142/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

        This suit involves two applications made by Plaintiff under the Act, one for DIB and one for

SSI.  In each application Plaintiff alleged an onset of disability date of June 13, 2001 (*see* Tr. 30).[1]

The applications were denied initially and on reconsideration (Tr. 421–22).  On April 25, 2007,

following a hearing, an administrative law judge (ALJ) found that Plaintiff was not under a disability

as defined in the Act at any time through April 25, 2007, the date of the ALJ's decision (Tr. 27–37).

In his decision, the ALJ specifically noted that Plaintiff had previously filed an application for DIB

under Title II of the Act, alleging the same disability onset date, which was denied by another ALJ

in a decision dated January 16, 2004 (Tr. 30; *see also* Tr. 52–68 (earlier ALJ decision)).  And,

because no evidence had been presented indicating that a reopening of the earlier decision was

warranted, the April 25, 2007 decision of the ALJ (the one at issue in this appeal), concerns the

period from January 17, 2004 through April 25, 2007 (Tr. 30).

        On February 6, 2008, the Appeals Council of the Social Security Administration denied

Plaintiff's request for review of the decision dated April 25, 2007 (Tr. 8–10).  Thus, the more recent

ALJ decision stands as the final decision of the Commissioner, subject to review in this court.

Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150

F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

        On April 25, 2007, the ALJ made several findings relative to the issues raised in this appeal

(Tr. 30–37):

> 1)      Plaintiff met the disability insured status requirements of the Act through December
>         31, 2006.
>
> 2)      Plaintiff has not engaged in substantial gainful activity ("SGA") during the period
>         under adjudication.
>
> 3)      Plaintiff has the severe impairments of lumbar degenerative disc disease, obesity,
>         diabetes mellitus, cervical stenosis, status post thoracic compression fractures, and
>         depressive disorder; however, he does not have an impairment or combination of

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 10, 2008
(Docs. 7, 8).

impairments, listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.

4)      As defined in the Regulations, Plaintiff is considered to be a "younger individual," aged 18–44, at all times relevant to the ALJ's decision.

5)      Plaintiff has a "high school" level of education and is able to communicate in English.

6)      Plaintiff is unable to return to his past relevant work.

7)      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferable job skills.

8)      Considering Plaintiff's age, education, work experience, and residual functional capacity ("RFC"), there are jobs that exist in significant numbers in the national economy that he can perform.

9)      Plaintiff has not been under a "disability," as defined in the Act, from January 17, 2004, through April 27, 2007, the date of the ALJ's decision

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but

not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, he is not disabled.

2.      If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing SGA and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[2]

A.   Personal History

Plaintiff alleges an inability to work as a result of a combination of physical and mental problems including chronic back pain caused by two fractures of his lower spine, degenerative joint disease of the spine, and scoliosis of the spine.  Plaintiff also alleges disability due to chronic neck pain caused by soft tissue damage in the cervical spine, as well as headaches, arthritis, diabetes, ankle pain, no movement in his left ankle, numbness and pain in his left leg, numbness in his left fingertips, depression, and anxiety.  Plaintiff contends that he is unable to sit, stand, or walk for long periods and that he is unable to bend or lift heavy objects due to pain.  He states that his diabetes causes him to experience frequent urination and difficulty sleeping, and pain contributes to his sleeping difficulties.  Plaintiff testified that he takes the prescription pain medication Oxycontin, as well as a muscle relaxer, tranquilizer, and diabetic oral medications.  Plaintiff indicated that his pain medication relieves some pain, but it makes him dizzy and sleepy, and he has difficulty focusing due to the combination of pain and medication side effects.

With respect to activities of daily living, Plaintiff reported that he is able to care for his own personal needs without assistance and that he has a valid driver's license and is able to drive.  Plaintiff states that he is physically able to cook, but he is unable to do household chores or his own shopping.  Plaintiff's children do the cooking, housework, and laundry, and his mother shops for him.  Plaintiff testified that he does not do much of anything during the day except lie on the couch or in the recliner, although he visits with his parents daily and with his brother once or twice a week.

---

[2]Unless otherwise noted, the information in this section is derived from the first ALJ opinion (Tr. 52–68).

B.      Relevant Medical History

Plaintiff's primary care physician is Jonathan E. Fountain, M.D., and the earliest records in the file from Dr. Fountain are dated in 1994 and follow Plaintiff's hospitalization for pneumonia with associated bronchospasm and hypoxia (*see* Tr. 257).  At Plaintiff's first visit following the hospitalization he was noted to be "much improved," and he reported recently quitting smoking after smoking two packs of cigarettes a day for the past five years (*id.*).  Plaintiff was congratulated for "smoking cessation and strongly encouraged continuing same" (*id.*).  Plaintiff returned in 1996 and reported that he had resumed smoking one year earlier (*id.*).  Plaintiff was diagnosed with diabetes, bronchitis,  probable hyperlipidemia, and obesity, and he was "strongly encouraged" to quit smoking, especially in light of the diabetes diagnosis (Tr. 256).  Records from 1996 through 2000 generally reflect Plaintiff's return to Dr. Fountain for treatment of his diabetes, as well as bronchitis, cervical strain, and other ailments (*see, e.g.*, Tr. 253–55).  In May 1997, Plaintiff reported exercising, feeling great, and having success with diet control and weight loss (Tr. 254).  In 1998, Plaintiff reported that he was still smoking and "unwilling to quit" (Tr. 252).  In 1999, it was noted that Plaintiff's diabetes was well controlled when Plaintiff was compliant with the physician-recommended diet, and Plaintiff was advised to exercise and lose weight (Tr. 250–51).  On February 21, 2000, Plaintiff advised Dr. Fountain that he injured his back trying to lift a 500-pound motor with his friend (Tr. 249).  Plaintiff's back was tender, he had limited range of motion ("ROM"), and he was assessed with lumbar strain (*id.*).  Plaintiff was provided with a Lortab prescription, but he was advised that it was not for regular use and was to be use sparingly (*id.*).

Plaintiff reported to an emergency room ("ER") on March 21, 2000, complaining of a right ankle injury and pain after tripping and falling in a hole at 4:00 in the morning (Tr. 186–87).  An x-ray revealed no fractures or "regions of bony destruction" (Tr. 189). A splint was applied, and Plaintiff was provided with Lortab and crutches, released, and advised to stay off his right foot for four days (Tr. 188, 191).

Plaintiff reportedly injured his neck and back in a slip-and-fall, on-the-job accident, in June 2000, after which he reported to an ER with complaints of neck and low back pain (Tr. 192–200).  Lumbar spine x-rays showed multiple compression fractures of the thoracolumbar joint area, which were probably old, with scoliosis biphasic of the lumbar spine and an incidental finding of spina

bifida of L5 (Tr. 198).  Cervical spine x-rays showed no obvious fractures or subluxations (Tr. 199).

Plaintiff was given a prescription for Lortab (Tr. 197).  Plaintiff followed up with the attending ER

physician, Zaher Kalaji, M.D., approximately one week later and continued to complain of severe

pain in his neck and lower back with radiation (*see* Tr. 164).  Dr. Kalaji ordered MRI scans of the

spine.  The cervical MRI scan showed no evidence of significant anterior impression upon the thecal

sac, but it revealed a mild annular bulge at the C4-C5 level and a more prominent annular bulge with

left paracentral prominent at the C5-C6 level, but no evidence of significant foraminal narrowing

at any level.  The MRI scan of the thoracic spine showed anterior compression deformity at T10 to

T11 with an accentuated thoracic kyphosis, but no significant impression upon the thecal sac at any

level.  The lumbar MRI scan was essentially unremarkable with only minimal degenerative disc

disease evident, with no demonstration of significant impression upon the thecal sac or narrowing

of the neural foramina.  At Plaintiff's next visit with Dr. Kalaji, in July 2000, Dr. Kalaji noted that

the MRI scan of the thoracic spine revealed thoracic kyphosis, a 25% anterior compression of T10,

a 30% anterior compression of T11, and disc dessication at T10 and T11.  Dr. Kalaji prescribed pain

medication and recommended pain management and orthopedic treatment.

In August 2000, Plaintiff was treated by orthopedic surgeon R. Barry Lurate, Jr., M.D., for

ongoing complaints of left-sided neck pain and low back pain.  Dr. Lurate noted that Plaintiff also

complained of left-sided occipital headaches, sometimes radiating to the parietal and frontal areas.

Examination revealed that Plaintiff had diminished ROM in his neck, but no obvious paraspinal

muscular spasm.  ROM in the lumbar spine was essentially normal, and neurologically, Plaintiff's

reflexes were normal, with no motor or sensory deficits.  Dr. Lurate commented on the recent MRI

scan findings, noting that the thoracic spine findings were obviously a chronic, long-term condition,

that the lumbar MRI scan was within normal limits, and that the cervical MRI scan was fairly

unremarkable other than for central spondylitic bulging at C5-C6, perhaps slightly eccentric to the

left.  Dr. Lurate recommended "conservative functional restoration treatment."  He administered a

trigger point injection, prescribed a non-narcotic pain reliever, and referred Plaintiff to physical

therapy.  When Plaintiff returned twenty-seven days later, Dr. Lurate reported that Plaintiff appeared

to have made a substantial recovery and that he was virtually symptom free.  A physical examination

revealed full voluntary ROM of the neck in all directions.  Plaintiff was released to full duty at that

time, Dr. Lurate stated that Plaintiff had reached maximum medical improvement, and no work restrictions were imposed (Tr. 156–83, 201–26).

Plaintiff returned to Dr. Fountain in September 2000, following his on-the-job injury (Tr. 248). Plaintiff reported a twenty-pound weight gain while out of work due to his neck and back injury, and Plaintiff was advised, in addition to his "usual work," that he should walk three days a week for thirty minutes (*id.*). Dr. Fountain's records, though, do not reflect complaints by Plaintiff concerning neck or back pain at this visit. However, in October 2000, Plaintiff presented to chiropractor Eric L. Frank with complaints of right-sided neck pain, low back pain, and left posterior thigh pain. Plaintiff reported that he had attempted to return to work but was unable to stand for eight hours due to neck and lower back pain. Dr. Frank indicated that he believed Plaintiff had a soft tissue injury and recommended treatment with manipulative chiropractic therapy. Dr. Frank's records indicate that he saw Plaintiff ten times through November 27, 2000, at which time he reported that Plaintiff had no lower back discomfort from either a subjective or objective standpoint. Dr. Frank stated that Plaintiff's low back pain had completely resolved, that Plaintiff had only very minimal right-sided cervical discomfort, that he did not anticipate that Plaintiff would experience any residuals, and Plaintiff was released from active treatment at that time.

Dr. Fountain continued to follow Plaintiff for his diabetes and hyperlipidemia, and in December 2000, Plaintiff presented to Dr. Fountain with complaints of significant daily headaches without significant neurologic symptoms except for some transient visual blurring (Tr. 246–47). Dr. Fountain ordered a CT scan of the head to further evaluate the headache complaints. The CT scan was normal (Tr. 264), and Dr. Fountain diagnosed Plaintiff's headaches as muscular in nature. Dr. Fountain's records do not reflect any specific complaints of neck or lower back pain at either of Plaintiff's visits in December 2000, and indeed, Plaintiff denied paresthesias, numbness, and weakness in the arms and legs at the December 19, 2000 visit, and he reported that his headaches had significantly improved with the medication previously prescribed by Dr. Fountain. At a March 2001 visit, Plaintiff reportedly told Dr. Fountain that he was resuming part-time work at the ball field. Plaintiff further stated that he had some improvement in his back and neck pain, and Dr. Fountain indicated that Plaintiff's diabetes was improved but was still suboptimally controlled due to Plaintiff's inactivity and non-compliance with a proper diet. On May 14, 2001, Dr. Fountain

renewed Plaintiff's prescription for Lortab, a narcotic pain medication, but he indicated that Plaintiff would not be given any more prescriptions. In April 2001, Plaintiff was provided with one last prescription of Lortab and advised to "make them last" (Tr. 246). Reluctantly, it appears, Plaintiff was given another Lortab prescription, but treatment notes reflect "no more — no exceptions" (Tr. 245). Plaintiff returned to Dr. Fountain in August 2001, reporting that he had been compliant with his diabetic medications and that his glucose control was improved. Plaintiff also reported that he had been working out to lose weight and improve his muscle tone. He did not report any problems with neck pain, lower back pain, or any other physical abnormalities. Further weight loss and exercise were recommended (Tr. 244). Plaintiff next saw Dr. Fountain in December 2001, at which time he reported only fair compliance with a lipid and diabetic diet, and he stated that his maximum fasting blood sugars had been around 160, with random levels over 200. However Plaintiff denied polyuria, thirst, visual blurring, and usual hyperglycemic symptoms, and he again made no complaints regarding neck and lower back pain (Tr. 243). Dr. Fountain next saw Plaintiff in April 2002 for treatment of a perirectal abscess, and he saw Plaintiff again in May 2002 for follow up for the abscess.

In May 2001, Plaintiff underwent an independent medical evaluation by Virgilio C. Barangan, M.D., at the request of the attorney who was representing Plaintiff in a worker's compensation claim (Tr. 201–26). Dr. Barangan reviewed Plaintiff's treatment records and diagnostic studies, and he summarized the contents of those records in his report. Plaintiff reported multiple complaints to Dr. Barangan, including bilateral occipital and frontal headaches, right neck pain, right neck muscle spasms, intermittent numbness in three fingers on his right hand, pain in the lower back and both buttocks radiating down to the posterior aspect of the right thigh and down to the right knee, muscle spasms of the right buttock, weakness of the right lower extremity, weight gain of thirty-two pounds, and depression. On physical examination, Dr. Barangan noted tenderness, muscle tightness, and decreased ROM in the cervical spine; loss of cervical lordosis, tenderness, and muscle tightness at the right suprascapular region; loss of lumbar lordosis, tenderness, and muscle tightness at the L3 to S2 paraspinal area; positive straight leg raising tests ("SLRs"); full ROM of both shoulders, elbows, and wrists; full ROM of both hips, knees, and ankles; normal reflexes in the upper and lower extremities; and no muscle atrophy. Dr. Barangan

listed as his diagnostic impressions annular cervical bulging discs at C4-C5 and C5-C6, post traumatic myofascial pain syndrome (strain/sprain) — right cervical and thoracic regions, bilateral occipital headaches, post traumatic myofascial pain syndrome — lumbosacral area, and old compression fractures at the T10 and T11 thoracic and L1 lumbar vertebra.  Dr. Barangan recommended EMG/NCV studies of the right upper extremity, additional chiropractic treatments and physical therapy as needed for pain relief, and referral to a pain management specialist.  With regard to Plaintiff's low back pain, Dr. Barangan noted that Plaintiff may need lumbar epidural steroid injections, lumbar facet blocks, and trigger point blocks on the tender area of his lumbosacral region (Tr. 212).  Finally, Dr. Barangan listed the following work restrictions:  no lifting greater than twenty pounds, no pushing or pulling greater than forty pounds, no bending at the waist, no stooping, kneeling, or crawling, no standing for more than one hour at a time, no sitting for more than one hour at a time, no climbing, no overhead work or above shoulder reaching, and limited strenuous repetitive neck and low back movements.

On March 13, 2002, Plaintiff began seeing Robin E. Murray, M.D., a pain management physician at the American Wellness Associates, for treatment of neck and back pain (Tr. 289–347).  At the initial visit, Dr. Murray noted that he performed a Dexa bone density scan and x-rays of the lumbar spine, and he administered intramuscular injections.  Although the results of the bone density scan and x-rays are not readily apparent from the record, it appears that after viewing the x-rays, Dr. Murray diagnosed Plaintiff with "disc/sciatica," degenerative joint disease, and morbid obesity, and he prescribed Oxycontin and a muscle relaxer.  Thereafter, Plaintiff began seeing Dr. Murray at least once a month and sometimes twice a month.  The treatment records reflect that Plaintiff received intramuscular injections and medication refills at each visit.  On April 30, 2002, Dr. Murray indicated a diagnosis of "HNP Lumbar," and on June 26, 2002, he stated a diagnosis of "chronic pain syndrome" and indicated that Plaintiff was "100% disabled for life" (Tr. 317, 319, 328).  Dr. Murray apparently based these opinions on abnormal lumbar x-ray results (*see* Tr. 317, 319).  Dr. Murray's report indicates that Plaintiff's x-ray showed "severe ankylosis, abnormal disc L-5, [and] severe degenerative joint disease."  Additionally, on June 27, 2002, Dr. Murray opined that Plaintiff "suffers from a mental impairment," that is, chronic pain syndrome, which "significantly interferes with daily functioning" (Tr. 266).  Plaintiff continued seeing Dr. Murray one to two times a month

from July 2002 through November 2004, and during that time he continued receiving intramuscular injections, and medication refills of Oxycontin, a muscle relaxer, and Xanax (*see* Tr. 289–347, 395–401, 416–420, 547–629). Dr. Murray again opined in March 2003 that Plaintiff was "100% disabled" (*see* Tr. 399). Moreover, in March 2003, Dr. Murray completed several forms on which he opined that Plaintiff was disabled and unable to work (Tr. 388–92). In a form titled "Medical Assessment of Ability to Do Work-Related Activities (Physical)," Dr. Murray opined that Plaintiff was limited to lifting only five pounds, he could stand or walk for a combined total of one to two hours in an eight-hour workday, and he could sit a total of two hours in an eight-hour workday (Tr. 388–89). Dr. Murray further indicated that the medical findings that support his assessment of Plaintiff's functional capacities and limitations were "ruptured disc/sciatica" (Tr. 388), and similarly, "disc/sciatica" (Tr. 389). In a form titled "Clinical Assessment of Pain," Dr. Murray opined that Plaintiff's pain was "found to be irretractably and virtually incapacitating" and that physical activity would cause an increase of pain to such a degree as to cause distraction from task or total abandonment of task (Tr. 390). With regard to prescribed medications, Dr. Murray opined that Plaintiff would be totally restricted and unable to function at a productive level of work. Finally, in a form titled "Absences From Work," Dr. Murray indicated that he would expect Plaintiff to be absent from work more than three times a month as a result of his impairments or treatment therefor (Tr. 392). In September and October 2003, Plaintiff saw Dr. Murray and reported pain at a 7 or 8 out of 10 with medication, and pain at a 9 out of 10 without medication (Tr. 616, 620). In February and March 2004, Dr. Murray noted that Plaintiff reported experiencing increasing pain and spasm (Tr. 593, 597, 601). Plaintiff had diffuse trigger point tenderness, positive SLRs, he was "acutely inflamed," and hydrocodone and non-steriodals were not helping; the only thing helping was Oxycontin and Xanax (Tr. 593). A similar record exists from April 2004, and at that time it was noted that Plaintiff suffered from "no major medication side effects" (Tr. 589). Also in April 2004, Dr. Murray again opined that Plaintiff suffers "from a mental impairment that significantly interferes with daily functioning and "100% disabled" (Tr. 580). Plaintiff's treatment continued to mainly consist of prescriptions for Oxycontin and Xanax, and in a treatment noted dated July 1, 2004, Dr. Murray opined that Plaintiff's pain was interfering with his sleep, daily activities, mood, strength, and ability to move (*see, e.g.*, Tr. 572). On July 9, 2004, Dr. Murray opined that Plaintiff's grip

strength, gait, and station were "OK," but he could not squat or walk on his heels or  toes (Tr. 567).
On July 27, 2004, however, Dr. Murray noted that Plaintiff could walk on his heels but stated that
Plaintiff could not walk on his toes or squat, and he needed to lose about 100 pounds (Tr. 568).  On
September 23, 2004, Dr. Murray noted that Plaintiff had abnormal MRIs and x-rays, and that he
suffered from chronic severe lumbar disc disease and chronic pain syndrome (Tr. 555).  Plaintiff
continued to demonstrate diffuse trigger point tenderness and positive SLRs (*id.*).  Dr. Murray's
treatment records do not indicate that Plaintiff was treated with epidural steroid injections, nerve
blocks, or lumbar facet blocks, as was suggested by Dr. Barangan in May 2001 (Tr. 212, 395–401,
416–20).

During the time Plaintiff saw Dr. Murray, he also presented to P.K. Garg, M.D. (*see* Tr.
384–87).  A November 29, 2002 treatment note indicates that Plaintiff was referred to Dr. Garg in
order to obtain MRI scans of his cervical and lumbar spine.  Dr. Garg ordered the requested tests,
and the cervical MRI scan showed borderline or mild spinal stenosis at C5-6 with left foraminal
narrowing, but no evidence of a herniated disc, spinal stenosis, or significant foraminal narrowing
at any other level.  The lumbar MRI scan showed evidence of early changes of desiccation at the L3-
4 level and degenerative changes at the facet joint complexes at the lumbosacral junction, but no disc
bulges or herniated discs were identified at any level (Tr. 404).

Plaintiff returned to Dr. Fountain in April 2004, for follow up with regard to his diabetes,
which was noted to be "near goal" at that time (Tr. 656).  Plaintiff reported being rather inactive due
to back pain, but Dr. Fountain recommended activity, such as non-weight-bearing exercise three to
four times a week for thirty minutes (*id.*).  In August 2006, Plaintiff's diabetes was noted to be "near
goal, best ever" (Tr. 710).  In October 2006, however, Dr. Fountain noted that Plaintiff had "very
poor compliance" with his diet, and his diabetes was "barely holding near goal" (Tr. 708).  Plaintiff
continued to see Dr. Fountain through December 2006, and the records generally reflect Plaintiff's
reported inactivity due to back pain, non-compliance with dietary and smoking cessation
recommendations, and recommendations by Dr. Fountain that Plaintiff exercise, including walking
(*see, e.g.*, Tr. 655, 655A).

Plaintiff saw J. Steven Hankins, D.O., MPH, from approximately December 2004 through November 16, 2006 (Tr. 665–84, 701–06), but for easier review of Plaintiff's claim related to Dr. Hankins, his records will be summarized in the discussion section, *infra*.[3]

C.     Information from Consultative Examiners and Non-Examining Agency Physicians

In July 2002, Plaintiff underwent a consultative physical examination and a consultative psychological evaluation by Douglas Bond, D.O. (Tr. 268–71). Dr. Bond's physical examination indicated that Plaintiff had tenderness and limited range of motion in the cervical and lumbar spine, but the examination of Plaintiff's upper and lower extremities was normal. Additionally, Dr. Bond noted that Plaintiff had no gross motor deficit and normal strength bilaterally. Plaintiff could do a heel-walk with some balance problems and could toe-walk and tandem-walk without problems. Plaintiff reported poor sleep because of pain, and he reported feeling depressed occasionally because of his loss of function. However, Plaintiff stated that he did not feel confused and that he had a good sense of self worth and no sense of suicidal ideation.

Thomas C. Peel, M.D., completed a Physical RFC Assessment on January 18, 2003 (Tr. 362–69). He opined that Plaintiff was able to frequently lift or carry ten pounds and occasionally lift or carry twenty pounds. Plaintiff could sit, stand, or walk for six hours in an eight-hour workday (Tr. 363). His ability to push or pull was unlimited (*id.*). Plaintiff was occasionally able to climb, balance, stoop, kneel, crouch, and crawl (Tr. 364). Additionally, Plaintiff was to avoid concentrated exposure to vibration and hazards, but no manipulative, visual, or communicative limitations were established (Tr. 365–66).

Mary E. Seay, M.D., completed a Physical RFC Assessment on February 7, 2003 (Tr. 370–77). She opined that Plaintiff could to lift or carry twenty pounds occasionally and lift or carry ten pounds frequently, and he could sit, stand, or walk for six hours in an eight-hour workday (Tr. 371). His ability to push or pull was unlimited (*id.*). Plaintiff was frequently able to climb and balance, except on ladders, ropes and scaffolds, and he could occasionally stoop, kneel, crouch, and crawl (Tr. 372). Additionally, Plaintiff was to avoid concentrated exposure to machinery and heights, but no manipulative, visual, or communicative limitations were established (Tr. 373–74).

---

[3]Plaintiff testified that he began seeing Dr. Hankins because Dr. Murray was no longer practicing (*see* Tr. 731).
Case No. 3:08cv142/MCR/EMT

In May 2005, another non-examining agency physician completed a Physical RFC Assessment, in which he or she[4] opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand or walk for about two to four hours and sit for about six hours in an eight-hour workday (Tr. 658). Dr. Sill also found Plaintiff had the unlimited ability, subject to the above restrictions, to push or pull, and that Plaintiff had various environmental and postural limitations (i.e., in his ability to climb, balance, stoop, kneel, crouch or crawl and with vibration and exposure to hazards such as heights or machinery), but no visual, manipulative or communicative limitations (Tr. 658–61).

Also in May 2005, Plaintiff underwent a physical consultative examination by Richard Lucey, M.D. (Tr. 644–49). In pertinent part, the examination revealed some diminished ROM throughout the neck and with hip flexion bilaterally, and "significantly decreased" ROM of the thoracolumbar spine (Tr. 645). Plaintiff had negative SLRs to full extension sitting and 50 degrees supine (id.). Plaintiff transferred slowly from sitting to supine due to back discomfort. Plaintiff was assessed with degenerative disc disease of the lumbar spine with chronic low back syndrome, probable degenerative arthritis in the cervical spine, and insulin dependent diabetes mellitus (id.).

## V.    DISCUSSION

Plaintiff raises several issues in the instant appeal. Plaintiff first contends that the ALJ failed to properly consider the opinions of three treating physicians, Dr. Fountain, Dr. Murray, and Dr. Hankins, and the opinions of Dr. Barangan, a one-time consultative examiner (Doc. 14 at 12–16). Next, Plaintiff contends that the ALJ erred in failing to find the following impairments severe: scoliosis of the lumbar spine, annular cervical bulging discs at C4-5 and C5-6, bilateral occipital headaches, and posttraumatic myofascial pain syndrome in the right cervical and thoracic regions and in the lumbosacral area (id. at 16–18). Plaintiff additionally contends that the ALJ erred in formulating Plaintiff's RFC and in evaluating his subjective complaints of pain (id. at 18–24).

---

[4]The ALJ identifies the physician as "Dr. Sill" (see Tr. 33), but the undersigned does not see Dr. Sill's name on the Assessment (see Tr. 657–63).

A.      Opinions of Treating Physicians and One-Time Examiner

Plaintiff first contends that the ALJ erred in his consideration of the opinions of three of his treating physicians, Dr. Fountain, Dr. Murray, and Dr. Hankins, as well as the opinions of Dr. Barangan, a one-time consultative examiner (*see* Doc. 14 at 12–13).

As this court is well aware, substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20

C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job

vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).  Within this framework, the court will review the ALJ's consideration of the opinions of the various physicians that are at issue in this appeal.

However, before beginning the discussion, it is important to note, as referenced *supra*, that at the beginning of the ALJ's decision he carefully explained, and concluded, that because he was not reopening the previous ALJ decision that had become final on January 16, 2004, the current decision would consider Plaintiff's condition only from January 17, 2004, forward (Tr. 30).  *See* 42 U.S.C. § 405(h) ("The findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing."); Cash v. Barnhart, 327 F.3d 1252, 1255 (11th Cir. 2003) (per curiam) (appropriate to dismiss hearing request because "doctrine of res judicata applies in [that] the Commissioner has made a previous decision about the claimant's rights on the same facts and the same issues, and this previous determination has become final"); Brown v. Sullivan, 921 F.2d 1233, 1237 (11th Cir. 1991) ("If the [Commissioner] merely considers newly proffered evidence without reconsidering the merits of the previously denied application, then he has not reopened that application.") (citation omitted).  Indeed, reconsidering the substantive evidence supporting the previous decision would have reopened that previous decision, which the ALJ had already specifically declined to do (Tr. 30).  *See* Cash, 327 F.3d at 1256 ("we have recognized an exception to this rule [on res judicata] . . . where a final decision on a prior social security claim is in fact reopened and reconsidered on the merits to any extent on the administrative level") (citation and internal quotation marks omitted).

Thus, at the outset, the court finds no error with regard to the ALJ's consideration of the opinions of Dr. Barangan, who examined Plaintiff on one occasion, in May 2001, in conjunction with Plaintiff's worker's compensation claim.  Dr. Barangan's examination was fully considered by the earlier ALJ, but not the more recent ALJ.  However, the more recent ALJ did not err because Dr. Barangan's opinions concern a time frame long before the time frame relevant to the decision of the ALJ that is under review by this court.  Thus, the undersigned will address only the opinions Dr. Fountain, Dr. Murray, and Dr. Hankins, all of whom treated Plaintiff after January 16, 2004.

i.      Dr. Fountain

In contending that the ALJ erred, Plaintiff states that the ALJ's decision "does not even mention Dr[]. Fountain [] by name, let alone address the medical evidence and opinions from [him]," and therefore his opinions must be accepted as true as a matter of law (*see* Doc. 14 at 13).

Indeed, the more recent ALJ decision does not specifically mention Dr. Fountain or his records, even though Dr. Fountain treated Plaintiff after January 2004.  Notwithstanding, the undersigned concludes that the ALJ did not err in failing to mention Dr. Fountain or summarize his post-January 2004 records.

First, although the ALJ did not mention Dr. Fountain and did not specifically state that he was "incorporating by reference" the earlier ALJ decision, he was obviously aware of the earlier decision because it is specifically mentioned in the instant decision, it is part of the record, and in the instant decision the ALJ stated he had considered the "entire case record" (*see* Tr. 34).  Moreover, the earlier ALJ decision not only mentions Dr. Fountain by name, it also summarizes several years of Plaintiff's treatment with Dr. Fountain (*see* Tr. 56–57), and in both decisions each ALJ found that Plaintiff's diabetes was severe, which was the condition for which Dr. Fountain treated Plaintiff.

Second, Dr. Fountain's post-January 2004 records are not extensive, and they clearly do not document a worsening in Plaintiff's condition.  For example, as noted *supra*, the records reflect an office visit in April 2004, at which time Plaintiff's diabetes was "near goal," and exercise was recommended three to four times a week (*id.*).  In August 2006, Plaintiff's diabetes was noted to be "near goal, best ever" (Tr. 710).  In October 2006, Plaintiff's diabetes was noted to be "barely holding near goal," but importantly his diabetes remained near goal even though Plaintiff was not

complying with the recommended diet (Tr. 708). Moreover, Dr. Fountain continued to recommend that Plaintiff exercise, and although Plaintiff reported being inactive, he reported that he was inactive because of back pain, not his diabetic condition — the condition for which he was treated by Dr. Fountain (*see, e.g.*, Tr. 655, 655A).

Third, although Plaintiff urges this court to accept as true "as a matter of law" the opinions of Dr. Fountain, Plaintiff does not point to any particular opinion that must be accepted as true, and the court is aware of no opinion by Dr. Fountain that if accepted would compel a finding of disability. Stated another way, even if all of Dr. Fountain's opinions since January 2004 are accepted as true, the record does not conclusively establish disability or even warrant remand for further consideration of Dr. Fountain's records. On the contrary, Dr. Fountain's post-January 2004 records reflect significant improvement in Plaintiff's condition when he was compliant with Dr. Fountain's recommendation, *see* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."), and importantly, further reflect that Plaintiff's condition was at its "best ever" after January 2004. The records also document Plaintiff's non-compliance with Dr. Fountain's recommendations, including his failure to follow a recommended diet. *See id.* at 1213 (refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."). Notwithstanding Plaintiff's non-compliance, Dr. Fountain's post-2004 records generally reflect overall improvement in Plaintiff's condition. Moreover, Dr. Fountain's repeated recommendations that Plaintiff exercise are inconsistent with a disabling condition, and any inability to exercise, as reported by Plaintiff, was because of Plaintiff's back pain, not his diabetic condition. Indeed, Plaintiff worked for years even though he was a diagnosed diabetic and was undergoing treatment therefor (*compare* Tr. 130 (Work History Report, reflecting employment from 1986 through 2001) *with* Tr. 256 (Plaintiff diagnosed with diabetes in 1996)).

While it might have been better for the ALJ to specifically mention Dr. Fountain's post-January 2004 records in the more recent decision, under the circumstances of this case the undersigned finds no error in the ALJ's failure to do so. *See* East v. Barnhart, 197 Fed. Appx. 899,

901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination).[5]

>    ii.    Dr. Murray

Plaintiff makes the same argument with regard to Dr. Murray, that is, that the ALJ failed to mention him or his records in the more recent decision (*see* Doc. 14 at 13).  Plaintiff is correct; the more recent decision does not discuss Dr. Murray's post-January 2004 treatment records.  Unlike the case with Dr. Fountain, however, the court finds that the ALJ erred with regard to Dr. Murray.

Dr. Murray's earlier opinions were considered, discussed at length, and rejected by the ALJ in the previous decision, including Dr. Murray's opinions that Plaintiff was "100% disabled" and opinions rendered on various forms in June 2002 and March 2003, including Physical RFC and Pain Assessment forms (*see* Doc. 17 at 14; Tr. 57–59, 62–63).  However, the file contains records from Dr. Murray that concern Plaintiff's treatment during the time frame relevant to this appeal, which were not addressed in the more recent decision of the ALJ, and which continue to document Dr. Murray's belief that Plaintiff is "100% disabled" and "suffers from a mental impairment that significantly interferes with daily functioning" (Tr. 580).  Although Dr. Murray's opinions (e.g., that Plaintiff was "disabled" and experiences significant interference with daily activities) were generally the same, both before and after the decision of the first ALJ, this court cannot utilize the reasons provided by the first ALJ to uphold the findings of the second ALJ.  Initially, the second ALJ did not state <u>any</u> reason for rejecting the more recent opinions of Dr. Murray, so this court would be upholding the ALJ's findings on a basis that does not appear in the record.  Moreover, Dr. Murray's post-January 2004 records document a worsening of Plaintiff's condition, including increased pain and spasm, positive SLRs, diffuse trigger point tenderness, and decreased activities due to pain.  Therefore, the reasons given by the first ALJ for rejecting Dr. Murray's opinions may no longer be valid.

Thus, the undersigned concludes that the ALJ erred, because Dr. Murray's post-January 2004 opinions are relevant to the time frame under consideration, they were rendered by a treating

---

[5]The undersigned cites <u>East</u> only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* U.S. Ct. of App. 11th Cir. Rule 36-2, 28 U.S.C.A.

physician, they are accompanied by treatment records from the same time frame, and the ALJ failed to acknowledge both the treatment records <u>and</u> the opinions in the more recent decision.

The question thus becomes whether a remand or reversal is the proper remedy for the ALJ's error.  In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts.  Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur.  *See, e.g.*, <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223–24 (11th Cir. 1991).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  <u>Davis</u>, 985 F.2d at 534; *see also* <u>Bowen v. Heckler</u>, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); <u>Carnes</u>, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216–17 (11th Cir. 1991) (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability"); <u>MacGregor</u>, 786 F.2d at 1050 (same).

Because improperly refuted opinions of a treating physician must be accepted as true, it is helpful to articulate the precise opinions (post-January 16, 2004) of Dr. Murray that must be accepted here.  These are opinions rendered in April 2004 that Plaintiff suffers "from a mental impairment that significantly interferes with daily functioning" and that Plaintiff is "100% disabled" (Tr. 580).  While the court is reluctant to compel the Commissioner to accept an opinion that a claimant is "100% disabled," *see* Social Security Ruling ("SSR") 96-5p (whether an individual is disabled is a question reserved to the Commissioner, and treating source opinions on such questions are "<u>never</u> entitled to controlling weight or special significance") (emphasis added), Dr. Murray's opinions, especially when considered with those of Dr. Hankins (as discussed below), establish disability without a doubt.  Therefore, a remand with directions to enter a finding of total disability is appropriate.  *See* <u>MacGregor</u>, 786 F.2d at 1050.

iii.    Dr. Hankins

As noted *supra*, Plaintiff was treated by Dr. Hankins, a pain management physician, for approximately two years, following Plaintiff's treatment with Dr. Murray.  At Plaintiff's first visit, on December 8, 2004, he displayed some limitation in ROM, as well as positive trigger points, but SLRs were negative (Tr. 684).  Plaintiff was assessed with chronic back pain and prescribed medications (Tr. 684).  Thereafter Plaintiff saw Dr. Hankins or his assistant, H.B. Steigerwald, a CRNP, on approximately a monthly basis (*see, e.g.*, 665–83).  While the earlier records are handwritten and somewhat difficult to decipher, it appears that Plaintiff continued to have negative SLRs and limited ROM, and that his medications "helped" control his pain (*see, e.g.*, Tr. 679, 682).  After February 2006, Dr. Hankins began using new forms to document Plaintiff's treatment (*compare* Tr. 669–84 *with* Tr. 665–88, 701–06).  The newer forms have boxes that can be checked, including "pain stable" and "pain exacerbation" (*see* Tr. 665–88, 701–06).  On each office visit, from March 2006 through November 2006, Dr. Hankins or CRNP Steigerwald checked the box indicating that Plaintiff's pain was stable and never checked the box indicating that Plaintiff had experienced an exacerbation of his pain (*see* Tr. 665–88, 701–06).  Moreover, Plaintiff was generally advised to continue on his current medications, lose weight, participate in a home exercise program, and return to Dr. Hankins in four-week intervals (*see* Tr. 705, 706).

On August 4, 2006, Dr. Hankins completed certain forms provided to him by Plaintiff's attorney (*see* Tr. 687, 689–91).  On a "Sedentary Requirements Checklist," in pertinent part, Dr. Hankins answered "no" to a question that asked whether Plaintiff could "be expected to attend any employment on an eight (8) hour/five (5) days a week basis" (Tr. 687).  On the same form he further opined that Plaintiff could use both hands, "sustain activity at a pace and with the attention to task as would be required in the competitive workplace," lift and carry ten pounds, sit up to six hours and stand up to two hours in an eight-hour workday, and walk short distances (Tr. 687).  Dr. Hankins additionally opined that Plaintiff had no "non-exertional impairment . . . in which pain, fatigue or intelligence substantially restrict [his] ability to function" (Tr. 687).  Next, on a "Clinical Assessment of Pain" form, Dr. Hankins opined that Plaintiff's "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work" and that physical activity would cause an increase of pain to such a degree as to cause distraction from task or total

abandonment of task (Tr. 689).  He further opined that Plaintiff's medications may present some

limitations, but "not to such a degree as to create a serious problem in most instances" (Tr. 690).

Finally, in a form titled "Absences from Work," Dr. Hankins opined that Plaintiff could be expected

to be absent from work more than three times a month due to "pain flareups" (Tr. 691).

In assigning "no weight" to the August 2006 opinions of Dr. Hankins, the ALJ stated:

I have given no weight to the form found in Exhibit B-11F [an exhibit that is actually
comprised of two forms, the Clinical Assessment of Pain form (Ex. B-11F at 2–3)
and the Absences from Work form (Ex. B-11F at 4)].  It identifies no impairment
upon which it is based; identifies no duration period for the assessment; relies upon
pain 'flareups' to justify itself,[6] yet the office notes repeatedly refer to the pain
being 'stable' with the 'exacerbation' box not being checked.  See Exhibits B-14F
at 1–7 [treatment notes from August to November 2006]; B-9F at 1-4 [treatment
notes from March to June 2006].  It is also inconsistent with the reasonable
limitations arising from the evidence of medically acceptable clinical and laboratory
diagnostic techniques, and, inferentially, takes the position, unsupported by the
evidence that [Plaintiff's] condition has not and will not respond favorably to
medical treatment.  See Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987).  The
opinion is also internally inconsistent:  No weight is given [to] the form in Exhibit
B-10F at 3 [the Sedentary Requirements Checklist].  It is internally inconsistent as
it says that the claimant is capable of all of the requirements of sedentary work, but,
without any explanation, contemporaneously says that [Plaintiff] would be absent for
unidentified periods.

(Tr. 33–34).

Plaintiff contends that the ALJ failed to articulate "good cause for rejecting Dr. Hankins'

opinion[s] . . . ," as contained on the three forms he filled out in August 2006 (see Doc. 14 at 15).

Thus, each of the forms will each be addressed in turn.

With regard to the "Absences from Work" form, the ALJ first stated that it identifies no

impairment upon which it is based or a duration period for the assessment.  While the form does not

identify the impairment upon which it is based, when read in conjunction with Dr. Hankins'

treatment notes, it is obvious that the opinions on the form are based upon the condition for which

he treated Plaintiff, chronic back pain.  The form did, however, specifically ask Dr. Hankins to

---

[6]The fact that the ALJ referenced "pain flareups" makes it clear that the ALJ was referring to the "Absences from Work" form, as that is the form on which the term is used (see Tr. 691), and the form on which Dr. Hankins opined that Plaintiff would be expected to miss work more than three times per month as a result of his impairments or treatment therefor (id.).

identify the underlying impairment, and he failed to do so (*see* Tr. 691), and perhaps this was the ALJ's point.  Notwithstanding, Dr. Hankins' failure to identify the precise impairment does not provide a substantial basis for discounting the opinion, in light of the treatment records that accompany the opinion, and which document the impairment.  While, as the ALJ noted, the form does not state the duration of time Plaintiff would be expected to miss more than three days of work per month, this too is an insubstantial basis for discounting the opinion.  First, the form did not ask Dr. Hankins to state the duration, and if the ALJ had any question about it he could have simply recontacted Dr. Hankins to find out.  Moreover, the opinion would logically concern the time frame relevant to his treatment of Plaintiff, which is a time frame relevant to this appeal.  Thus, only one reason offered by the ALJ supports his decision to discount the opinion on the "Absences from Work" form, that is, that Dr. Hankins based the opinion on "pain flareups," but his treatment notes do not support this basis.  As the ALJ noted, Dr. Hankins' treatment notes consistently reflect "stable" pain and no pain exacerbation.  Whether this one reason provides a basis to uphold the ALJ's ultimate findings with regard to the "Absences from Work" form, however, need not be decided because Exhibit B-11F consists of two forms, the Absences from Work form and the Clinical Assessment of Pain form (*see* Tr. 689–91), and the ALJ did not address the Clinical Assessment of Pain form.  Thus, the opinions on the Pain Form must be accepted as true.  In pertinent part, these opinions include, "pain is present to such en extent as to be distracting to adequate performance of daily activities or work" and physical activity will increase pain "to such a degree as to cause distraction from task or total abandonment of task" (Tr. 689).  When considered in conjunction with Dr. Murray's opinions that must be accepted as true, disability has again been established without a doubt.  This conclusion is bolstered, with regard to Dr. Hankins, because a Vocational Expert ("VE") testified that Plaintiff would be precluded from all work if the opinions on the forms in Exhibit B-11F were accepted as true (Tr. 734).  Although the ALJ did not question the VE separately about each form contained in Exhibit B-11F, the ALJ specifically asked the VE to accept as true that Plaintiff "has the degree of pain that his pain management doctor has recorded in [Exhibit] B-11F," as well as his opinions on the Absences from Work Form, and the VE specifically stated that Plaintiff would "not be able to sustain work in any occupation in the national economy" (Tr. 734).

Lastly, Dr. Hankins completed a Sedentary Requirements Checklist (Tr. 687), which the ALJ discounted, finding that it was "internally inconsistent as it says that [Plaintiff] is capable of all of the requirements of sedentary work, but, without any explanation, contemporaneously says that [Plaintiff] would be absent for unidentified periods" (Tr. 34).   However, the undersigned does not find that the form is necessarily internally inconsistent.   As noted *supra*, the form states that Plaintiff would not "be expected to <u>attend</u> any employment on an eight (8) hour/five (5) days a week basis" (Tr. 687) (emphasis added).   Thus, it appears that Dr. Hankins opined that Plaintiff is not capable of full-time work (i.e., "attending" work eight hours a day, five days per week), but when Plaintiff is capable of "attending work," he has the ability to perform sedentary work.   This is seemingly consistent with Dr. Hankins' opinion on the "Absences from Work" form that Plaintiff would likely miss more than three days of work per month.   Thus, the undersigned does not find that the ALJ's basis for rejecting the opinion necessarily has substantial support in the record.   Whether it does or not, however, does not change the conclusion that this case should be remanded for an award of benefits, in light of the other opinions that must be accepted as true and which establish disability.

In conclusion, as the court is well aware, the opinions of treating physicians are entitled to the greatest amount of deference.   *See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship (treating sources are given more weight), including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").   And, in the instant case, in order to find Plaintiff "not disabled," the ALJ was required to reject the opinions of two of Plaintiff's long term treating physicians, and assign "very significant weight" to the opinions of Dr. Lucey, a one-time consultative examiner, who provided no opinions regarding Plaintiff's physical capacities, and "Dr. Sill," a non-examining agency physician (*see* Tr. 33).   While this would have been permissible had the ALJ properly discounted the opinions of Dr. Murray and Dr. Hankins, here the ALJ erred in discounting their opinions, and correspondingly, erred in accepting the opinions of Dr. Lucey and Dr. Sill instead.   In doing so, the ALJ also erred in determining Plaintiff's RFC because the RFC largely based upon the opinions of

Dr. Sill (*compare* Tr. 32–33 (ALJ's RFC determination) *with* Tr. 657–64 (Dr. Sill's Physical RFC Assessment)).[7]

Thus, for the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed.  *See* 42 U.S.C. § 405(g); Lewis, 125 F.3d at 1441 (reversing the Commissioner's decision and remanding with instructions that the claimant be awarded benefits).

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that this action be **REMANDED** to the Commissioner to enter a finding of total disability and award disability benefits, and that the clerk be directed to close the file.

At Pensacola, Florida this 24th day of March 2009.


/s/ *Elizabeth M. Timothy*                                    
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[7]In light of the necessity for a remand, the court need not address Plaintiff's remaining contentions.